March 16, 1939


Hon. R. Emmett Morse
Speaker, House of Representatives
Austin, Texas

Dear Sir:

Opinion No. O-489
Re: Constitutionality of H. B. 247, relating
to horse-racing under certain conditions

We have your letter of March 13th, stating the request of the House
of Representatives for our opinion as to the constitutionality of pending
House Bill No. 247.

While your letter did not specify any particular part of the Act,
which has a "savings clause" (Sec. 52), since its effectual operation is
governed by the sections proposing to permit ratification or rejection
of permit holders to conduct horse races, by the voters of counties under
stated provisions, we shall discuss those sections, inviting further in-
quiry on any portions of the bill not considered by us.

The bill creates The Texas Horse Racing Commission, provides for
its organization and incidentals thereto, contains certain revenue and
tax features, and provides for the distribution of its funds, when and if
collected.

The general powers of the Commission are stated in Section 8:

"The Commission is hereby authorized and empowered to adopt
rules and regulations for the control and supervision and direc-
tion of applicants, permittees and licensees for the holding,
conducting and operating of all horse race meetings held in this
State, provided such rules and regulations shall be uniform in
their application and effect, and the duty of exercising this
control is hereby made mandatory upon such Commission."

As we understand the salient working features of the bill, the method
of operation is thus prescribed:

A person (association or corporation) must first file an application
with the Commission to conduct a horse race meeting and operate a pari-

mutuel betting pools. He must comply with certain requirements of Sec. 13, giving in full the information there prescribed. He pays a fee of $50.00 to the Commission. The Commission then holds a public hearing, and if the Commission concludes the applicant complies with all the provisions of law, the rules and regulations of the Commission and is financially able to con-duct the proposed meet, and the community wherein the track is located is not already adequately served with racing,

> "the Commission shall issue a permit to the applicant, subject to ratification or vote of the people residing within the county wherein the horse race track is located at a referendum held for that purpose and as hereinafter provided for." (Sec. 13; under-scoring ours).

Such permit is then certified to the Commissioners' Court of the County wherein is located the track at which the races are proposed to be operated. It is then the duty of the Commissioners' Court to call an elec-tion at the expense of the applicant and there is submitted to the qualified voters the question of the approval or rejection of the particular permit granted by the Commission. The form of ballot is set out:

> "For the approval of the permit granted by the Texas State Racing Commission to .,...(naming the permittee) to hold and conduct horse race meetings at ,.... track (naming the track) in ..... County (naming the county)", and the words, "Against the appro-val of the permit granted by the Texas State Racing Commission to .... (naming the permittee) to hold and conduct horse race meetings at .... track (naming the track) in .... County, (nam-ing the county)."

If the result of the election is favorable to the approval of the permit, an approved permit is then issued by the Commission to the appli-cant or permittee, which entitles the permittee to issuance of a license by the Commission for a period of one year upon payment of the license fee provided in the Act. No further discretion exists to the Commission, if the fee is paid.

Thereafter, the license, upon application, may be renewed from year to year during the period of the permit, which is ten years, provided the Commission finds the applicant still possesses all the qualifications provided by the Act and that the permit has not been revoked by a subse-quent election, and that the licensee has not violated any of the provi-sions of the Act or the rules and regulations of the Commission made and provided for in the Act. An approved permit expires after a period of ten years and no license may be issued after the expiration of the period of the approved permit. The Commission is vested with power to suspend or revoke any license or permit if it be made to appear to the satisfac-tion of the Commission that the holder or holders thereof have violated any provision of the Act or any rule promulgated by the Commission.

Independent of the findings of the Commission, a permit or license once approved may be revoked by majority vote of the electorate of the county where such racing is allowed, if twenty (20%) per cent of the total qualified voters petition for such referendum, and if the expenses of such election are provided for. This may be done as often as once every two years.

Section 33 of the proposed bill reads as follows:

"Every horse race meeting at which racing is conducted and pari-mutuel pools are operated, except as allowed by this Act, is hereby prohibited and declared to be a public nuisance, and every person, association or corporation aiding or abetting therein or conducting or attempting to conduct horse racing and operate pari-mutuel pools in this State not in conformity with this Act shall be deemed guilty of a felony and upon conviction thereof be confined in the state penitentiary for not less than one year nor more than ten years."

In analyzing the provisions of the proposed legislation, we must recognize and take into consideration certain inalienable principles upon which our form of government is based. The Texas Constitution ordains that the powers of our government shall be divided into three distinct depart-ments with specific and exclusive delegation of power to the legislative branch to enact or suspend law. All official authority in Texas is derived from the people as delegated in the constitution. Even the people them-selves are bound by that document, until they change it as provided by its express terms.

Ours is a representative democracy, as opposed to a pure democracy. The laws are made not by the people directly, but through their chosen repre-sentatives. See Art. 1, Sec. 2 and 28, Bill of Rights; Art. 2, Constitution; Ex Parte Farnsworth, 133 S. W. 535, 33 L. R. A. (New Series) 968; State v. Swisher, 17 Tex. 441; Lyle v. State, 193 S. W. 680.

Under the provision of Section 33 of the bill, supra, the racing of horses with pari-mutuel betting is prohibited throughout the State and in every county in it, until some specific one individual (or association or corporation) can obtain a majority vote of the electors within some one county of this State wherein is located a race track. No matter the said individual has satisfied fully every regulation of the statute, every rule of the Commission, every whim or caprice of the individual members of the Commission. The designated "permit" gives the holder thereof no right to conduct a race, and he would be subject to penal servitude in the penitentiary if he undertook the operation of racing (with betting), be-fore the voters of the county favored him with their favorable referendum.

The question of whether the people of the various counties may by local option election suspend the general laws has been definitely and con-clusively settled in Texas. Likewise, that the Legislature cannot delegate

its legislative functions to local option, to place in force or not place in force a general law. The first Supreme Court of Texas in the case of State v. Swisher, 17 Tex. 441, uses the following language:

"The mode in which the acts of the Legislature are to become laws is distinctly pointed out by our Constitution. After an act has passed both houses of the Legislature, it must be signed by the speaker of the house and the president of the senate. It must then receive the approval of the Governor. It is then a law. But should the Governor veto it and send it back, it can only become law by being passed again by both houses, by a constitutional majority. There is no authority for asking the approval of the voters at the primary elections in the different counties. It only requires the votes of their representatives in a legislative capacity. But, besides the fact that the Constitution does not provide for such reference to the voters to give validity to the acts of the Legislature, we regard it as repugnant to the principles of the representative government formed by our Constitution. Under our Constitution the principle of lawmaking is that laws are made by the people, not directly, but by and through their chosen representatives. By the act under consideration this principle is subverted, and the law is proposed to be made at last by the popular vote of the people, leading inevitably to what was intended to be avoided, confusion and great popular excitement in the enactment of laws." State v. Swisher, supra.

This rule of law was subject to much discussion by the courts, and at one time the Supreme Court favored the rule while the majority of the Court of Criminal Appeals did not, but in the case of Lyle v. State, 193 S. W. 680, the reasoning of the Swisher case, supra, is set out and adopted by the latter court, as is the following language of Chief Justice Phillips in the Supreme Court case of Ex Parte Mitchell, 177 S. W. 953:

"The case presents the question of the constitutionality of the referendum act of the Thirty-third Legislature authorizing the qualified voters of any county, or certain political subdivisions of a county, to determine by an election whether pool rooms or pool halls should be prohibited therein, and making it an offense to there operate or maintain them if the result of the election be in favor of their prohibition.

"The constitutionality of the act is assailed upon two grounds: (1) That it amounts to a delegation by the Legislature of its own legislative power, imposed upon it by the Constitution, which it alone must exercise, and which it may not commit to any other agency; (2) that it authorizes the suspension of a general law of the state by the voters of a county, or subdivision of a county, namely, the statute licensing the operation of pool halls generally within the state, in violation of article 1, para. 28, of the Constitution,

which is "No power of suspending laws in this State shall be exercised, except by the Legislature; an amendment of previous Constitutions which permitted such suspension under 'the authority' of the Legislature.

"The act is plainly unconstitutional, in our opinion, for both of these reasons. We largely rest our decision as to the first question upon State v. Swisher, 17 Tex. 441, where an act of the Legislature in no way dissimilar in its effect from this one was upon this ground held unconstitutional by the first Supreme Court of the state. That decision has never been overturned, and is the law upon the question. The second question is equally well settled, according to our view, by Brown Cracker & Candy Co. v. City of Dallas, 104 Tex. 290, 137 S. W. 342, Ann. Cas. 1914B, 504."

In adhering the Court of Criminal Appeals to the Supreme Court view, Judge Morrow in the Lyle case, supra, says:

"We are unable to find anything in our constitutional and judicial history upon which to base a conclusion that the decision of the Supreme Court in following the rule in the Swisher case is unsound. On the contrary, we have pointed out hereinabove much that, in our judgment, supports its correctness."

In the case of Jannin v. State, 51 S. W. 1126, it appeared the Legislature had passed a statute making it a penal offense for any other person than the agent of a railroad company to sell its tickets, with the further provision that it should not apply to tickets on which it was not plainly printed that it was a penal offense for the holder to transfer the same. The majority of the court held the act unconstitutional, employing this language:

"We accordingly hold that because the legislature left it optional with the railroad companies whether or not, in the issuance of tickets, they would create a penal offense, the act of the legislature is without authority of law; is violative of the law, in that it does not define with certainty an offense; does not itself create an offense, but delegates its authority to another agency to make the sale of railroad tickets a violation of the law. In this respect it would appear to be violative of section 28 of our bill of rights, which says: 'No power of suspending laws in this state shall be exercised except by the legislature.' See Suth. St. Const. Para. 69. We therefore hold that the sale of railroad tickets in this case is not a violation of law."

In the case of Ex Parte Maynard, 275 S. W. 1070, it appears the City of Jacksonville, Texas, enacted an ordinance making it unlawful for persons engaged in the transfer business to solicit hire of passengers, about any railroad station, exempting from operation of the ordinance

persons under contract with a railroad to transfer its through passengers or baggage to another railroad station. The Court of Criminal Appeals in its original opinion by Presiding Judge Morrow, and in the opinion on motion for rehearing by Judge Lattimore, held the ordinance in contravention of the constitution, based on "the well settled rule that <u>the power to make laws which, by their terms, become and are effective or not at the pleasure of individuals or corporations, does not exist in the Legislature, and cannot be asserted by a municipality created under legislative authority.</u>" (Underscoring ours).

In the case of Ex Parte Farnsworth, 133 S. W. 535, 33 L. R. A. (New Series) 968, an ordinance of the City of Dallas was adopted by referendum vote. Said ordinance was authorized by the "initiative and referendum" clause of the charter granted by the Legislature. Farnsworth was arrested and charged with a violation of the ordinance. The Court of Criminal Appeals had before it an original writ of habeas corpus. Relator was discharged, the court striking down the referendum clause.

We find these words in Judge Davidson's opinion:

"That the referendum is adverse to our constitutional form of government as a means of putting into operation enactments by the legislature has been expressly decided in this state as early as State v. Swisher, 17 Tex. 441. That case has been recognized and followed in subsequent decisions. See Stanfield v. State, 83 Tex. 319, 18 S. W. 577, and also Werner v. Galveston, 72 Tex. 22, 7 S. W. 726, 12 S. W. 159. In the last cited case, Judge Gaines, writing the opinion, uses this language: 'It is a well-settled principle that the legislature cannot delegate its authority to make laws, by submitting the question of their enactment to a popular vote...' It is equally certain that the people cannot be reinvested by the legislature with the functions of legislation conferred by them on a department of government, nor can the legislature render the enactment of a law dependent upon the acceptance by the people by popular vote. See cases already cited. Ex parte Wall, 48 Cal. 279, 17 Am. Rep. 425; Morford v. Unger, 8 Iowa, 82; Santo v. State, 2 Iowa 165, 63 Am. Dec. 487; State v. Beneke, 9 Iowa, 203; State ex rel. Dome v. Wilcox, 45 Mo. 458; Gibson v. Mason, 5 Neb. 283; Cincinnati, W. & Z. R. Co. v. Clinton County, 1 Ohio St. 77. This inability arises no less from the joint principle applicable to every delegated authority requiring knowledge, discretion, and rectitude in its exercise, than from the positive provisions of the Constitution itself. The people in whom the power resided have voluntarily transferred its exercise, and have positively ordained that it shall be invested in the legislature. To allow the legislature to cast it back on the people would be a subversion of the Constitution, and would change its distribution of power without the action or consent of those who created the Constitution."

Local option elections to determine the law applicable to the several counties have been sustained as to prohibition of intoxicating liquor and prohibition of stock running at large, but in each instance direct authority is given by the Constitution. Another exception is noted in some cases, such as City of San Antonio v. Jones, 28 Tex. 19; Werner v. City of Galveston, 72 Tex. 27; Riley v. Town of Trenton, 184 S. W. 344; Spears v. City of San Antonio, 223 S. W. 166 and Johnson v. Martin, 12 S. W. 321, but many of these are distinguished by Judge Morrow in the Lyle case, supra, as cases wherein municipal corporations are concerned and where charter provisions are declaratory. The later cases are likewise distinguishable. None of these cases are analogous to the bill before us and none of them decide the question of whether an act of the Legislature general in application would be given life by the vote of the people of the county.

The case of Trimmier v. Carlton, 296 S. W. 1070, has been suggested to us as authority for the validity of this bill. A careful study of the lengthy opinion in that case will disclose the power of the Board of Water Engineers to exercise much discretion after the vote has been declared; that there is constitutional authority for the procedure followed; and specifically recognizes the principles of law discussed herein. The cases of Ex Parte Farnsworth, Ex Parte Mitchell, and State v. Swisher, herein cited are recognized by style, and no intimation given they should be overruled.

We have carefully considered the question and for the reasons given and cases discussed, are of the opinion that H. B. 247 is unconstitutional insofar as its provisions pertain to approval of the permit by the voters before issuance of license.

We do not question the legal right of the Legislature to legalize racing with pari-mutuel betting by passage of a general bill so providing, nor do we deny the right to create a commission to administer and supervise same. It is well known that Commissions created by the legislature to administer laws complete within themselves have been declared a valid exercise of the legislative power, but in no instance have we found where the appellate courts sanction such a procedure as set out in the bill you submit.

Very truly yours

ATTORNEY GENERAL OF TEXAS

(Signed)  Benjamin Woodall
By
Benjamin Woodall
Assistant

BW:AW
APPROVED:
(Signed)  Gerald C. Mann
ATTORNEY GENERAL OF TEXAS